O

# United States District Court
# Central District of California

| | |
|---|---|
| JONATHAN GARCIA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case № 2:16-CV-01664-ODW-AGR<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I. INTRODUCTION

On January 23, 2018, the Court held a one-day bench trial in this action. (ECF No. 78.) Plaintiff Jonathan Garcia asserts damages relating to an incident on May 9, 2014, during which Special Agent Charles Valentine shot him. Special Agent Valentine is an agent of the Drug Enforcement Administration ("DEA"), and was on duty at the time of the incident. Garcia brings claims against the United States under the Federal Tort Claims Act ("FTCA"), sounding in the theories of battery and negligence.

The parties submitted, and the Court admitted into evidence, testimony of the parties' direct witnesses through declarations and/or deposition testimony. The parties submitted the direct testimony of: Jonathan Garcia, Special Agent Valentine, Scott DeFoe, Mark Gannon, Special Agent John Eric Neal, Felix Yip, M.D., and Ron

Martinelli, Ph.D. (ECF Nos. 55–61.) The parties cross-examined Jonathan Garcia, Special Agent Valentine, and Scott DeFoe live in the courtroom.

Having carefully reviewed and considered the evidence and the arguments of counsel as presented at trial and in their written submissions, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such, and vice versa.

## II. FINDINGS OF FACT

### A. The investigation into the cocaine trafficking organization

1. The DEA and the Los Angeles Interagency Metropolitan Police Apprehension Crime Taskforce (LA IMPACT) began a joint investigation into a cocaine trafficking organization in 2014.

2. In February 2014, an undercover law enforcement officer working with LA IMPACT met a Hispanic female known as Alex who said she routinely set up 30–40 kilogram cocaine transactions.

3. The undercover officer told Alex that he had access to kilograms of cocaine from Mexico and that he would be willing to work with her.

4. DEA Special Agent John Eric Neal ("Special Agent Neal") supplied the undercover officer with an encrypted cell phone, which the undercover officer gave to Alex.

5. The phone allowed Special Agent Neal to monitor the messaging on the phone.

6. Alex used the phone to contact individuals about narcotics transactions.

### B. The cocaine transaction at Garcia's house

7. Alex contacted the undercover officer in early May 2014 and asked him to provide 12 kilograms of cocaine for a deal in Montebello, California.

8. The day before the transaction, Alex told the undercover officer that the buyers were from New Jersey and that the price would be $23,500 per kilogram.
9. The undercover officer agreed to the price and amount.
10. The undercover officer told Special Agent Neal about the deal.
11. The next morning, May 9, 2014, Alex told the undercover officer that the deal would happen at 737 Carmelita Place in Montebello, at 1:30 p.m. . The undercover officer told this information to Special Agent Neal.
12. Special Agents Neal and Valentine ran a background check on 737 Carmelita Place and learned that Garcia lived there.
13. Special Agents Neal and Valentine viewed Garcia's driver's license photo.
14. Special Agents Neal and Valentine also searched law enforcement databases for Garcia's criminal history and learned that he had been charged with money laundering in New Jersey and convicted of possession of a controlled substance for sale in California.[1]
15. Garcia had been communicating with Alex to set up the cocaine deal. He communicated with her using his BlackBerry phone.

## C. Law enforcement approaches Garcia's house and he flees

16. Law enforcement officers began surveillance of 737 Carmelita Place around noon on May 9, 2014.
17. In addition to the LA IMPACT officers watching the front of the house, DEA agents, including Special Agent Valentine, provided perimeter security around the neighborhood.

---

[1] Plaintiff objects to the portions of Special Agent Valentine's declaration regarding what he learned about Garcia's criminal history on grounds that the testimony constitutes hearsay and is unfairly prejudicial and confusing. (ECF No. 68.) The Court **OVERRULES** Plaintiff's objections.

3

18. A DEA helicopter patrolled overhead and used the radio to report observations to officers on the ground.
19. Garcia was in the front yard when another man arrived at 12:30 p.m.
20. The man and Garcia walked to the detached garage behind the house.
21. Fifteen minutes later, Garcia walked out to the street, got in a black Jeep, and drove it to the garage.
22. The other man took a 15" x 15" box from the garage and put it in the Jeep.
23. Garcia then drove the Jeep back out to the street.
24. As Garcia was moving the Jeep, Alex called the undercover officer and said the buyers were done counting the money and were ready for the undercover officer to bring over the 12 kilograms of cocaine.
25. The undercover officer said he would send someone over with the cocaine in about 20 minutes.
26. A silver Range Rover with New Jersey plates arrived at 1:20 p.m. and backed into the garage behind the house.
27. Two men got out of the Range Rover.
28. A few moments later, a red truck arrived.
29. One of the men from the Range Rover got into the red truck, and the truck began circling the neighborhood.
30. At that point, the LA IMPACT officers decided to freeze the location, detaining the occupants while they got a search warrant.
31. As the officers approached the house, Garcia exited the house through a back window and fled through the yards of residences adjacent to his house, scaling several fences in the process.
32. Garcia emerged on the other side of the block, in the driveway of the residence at 740 Davis Avenue.

**D.    The shooting**

33. Special Agent Valentine was stationed in his car on Davis Avenue, one block west of Garcia's house, providing perimeter security.
34. Special Agent Valentine heard the DEA helicopter call out play-by-play radio reports about Garcia's movements as he fled.
35. The helicopter reported that Garcia was in the backyard of a tan house with a dark-colored van parked in front.
36. Special Agent Valentine saw the tan house and van, got out of his car, drew his handgun, and approached the house on foot.
37. He heard a banging noise that sounded like a person jumping a fence.
38. Special Agent Valentine was standing in the street and looking east into the driveway of 740 Davis Avenue.
39. Special Agent Valentine saw Garcia in the driveway, about 20–25 yards away, with his body facing the street and his head looking back over his shoulder at the fence behind him.
40. Special Agent Valentine pointed his gun at Garcia and twice yelled, "DEA police, get on the fucking ground."
41. Garcia turned his head and saw Special Agent Valentine.
42. Garcia then immediately "bladed" his body, turning his right side away from Special Agent Valentine to try to conceal it.
43. As Garcia was blading his body, Special Agent Valentine saw Garcia reaching at his waistband with his right hand.
44. Once Garcia turned his right side away, Special Agent Valentine could not see what was in Garcia's hand because Garcia's body blocked his view.
45. Garcia then backpedaled about 5–7 feet toward the porch of 740 Davis Avenue, keeping his body bladed away from Special Agent Valentine.

5

46. Special Agent Valentine yelled, "Get your hands out of your pocket!" at least two times and, "Show me your hands!" at least two times.
47. Garcia did not comply with Special Agent Valentine's commands.
48. When Garcia reached the porch, he sat down on the edge of it, with his legs in the driveway.
49. Special Agent Valentine could not see what was in Garcia's right hand because of Garcia's body position.
50. Once Garcia sat on the porch, Special Agent Valentine saw Garcia moving his right elbow in a manner he interpreted as consistent with drawing a pistol from a holster.
51. Special Agent Valentine, fearing that Garcia was about to draw a gun and shoot at him, fired two shots in quick succession.
52. One shot hit Garcia in the jaw.
53. Garcia then stood up, and as he was standing, he dropped a BlackBerry cell phone into a planter on the porch.
54. When Garcia was standing, he put his hand on the driveway in front of him, and laid flat on his stomach.
55. Special Agent Valentine called out over the radio that he had a suspect in custody and that the suspect had been shot.
56. Other officers arrived, handcuffed Garcia, and called an ambulance.
57. Paramedics took Garcia to the hospital.
58. In a planter on the porch of 740 Davis Avenue, officers found a BlackBerry cell phone belonging to Garcia.

E. **Garcia's injuries**

59. As a result of the shooting, Garcia sustained serious injuries. The bullet destroyed both sides of his jaw, as well as several of his teeth and the bones around his mouth. Garcia required several surgeries and medical procedures following the shooting as a result of his injuries.

60. Garcia was admitted to LAC-USC Medical Center on May 9, 2014, and was discharged from LAC-USC Medical Center approximately one month later.

### F. Garcia's conviction and sentence

61. Based on his role in the attempted drug transaction, Garcia pled guilty to one count of conspiracy to distribute cocaine, a felony, and is expected to begin serving a 25-month sentence in a federal prison in June 2018. Garcia's commitment date has been delayed due to his need for medical treatment as a result of the injuries he sustained during the shooting.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction and venue

62. The Court has jurisdiction over this FTCA case pursuant to 28 U.S.C. § 1346(b)(1).

63. Venue is proper in this judicial district under 28 U.S.C. § 1402(b) because the acts and omissions complained of occurred in this judicial district and the plaintiff resides in this judicial district.

### B. Governing law under the Federal Tort Claims Act

64. Under the FTCA, the substantive law of the state where the allegedly tortious act applies. 28 U.S.C. § 1346(b)(1). To be cognizable, the claim must arise from the negligent or tortious act of a government employee acting within the scope of his employment under circumstances where the United States, if it were a private individual, would be liable under the law of the state where the claim arose. 28 U.S.C. § 2674.

65. California law governs Garcia's claim based on the shooting incident occurring in Montebello, California.

### C. Elements of Garcia's battery claim

66. To prevail on his battery claim, Garcia must show that (1) Special Agent Valentine intentionally touched Garcia or caused Garcia to be touched;

(2) Special Agent Valentine used unreasonable force to arrest Garcia, overcome Garcia's resistance, or defend himself or others against Garcia; (3) Garcia did not consent to Special Agent Valentine's use of force; (4) Garcia was harmed; and (5) Special Agent Valentine's use of unreasonable force was a substantial factor in causing Garcia's harm.

### D. Elements of Garcia's negligence claim

67. To prevail on his negligence claim, Garcia must show that Special Agent Valentine "had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Nally v. Grace Cmty. Church*, 47 Cal. 3d 278, 292 (1988).

### E. Reasonable Force

68. In a use-of-force case, to prevail on either a battery or negligence claim, the plaintiff must establish that the use of force was unreasonable.

69. The unreasonable force element is governed by the same standard as excessive force under the Fourth Amendment. *Saman v. Robbins*, 173 F.3d 1150, 1156–57 & n.6 (9th Cir. 1999).

70. The reasonableness of an officer's use of force is judged in light of the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The reasonableness inquiry is conducted "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* It takes into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

71. The reasonableness inquiry does not require an officer to have delayed their fire until a suspect turns a weapon on them. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Id.*
72. Under this standard, when an officer reasonably believes that a suspect is about to draw a firearm and shoot the officer or another person, the officer's decision to use deadly force on the suspect is not unreasonable. *See id.*

**F. Liability**

73. Garcia did not meet his burden of proof in establishing that the United States is liable on his battery claim.
74. Garcia did not meet his burden of proof in establishing that the United States is liable on his negligence claim.
75. Garcia did not meet his burden of proof in establishing that Special Agent Valentine used unreasonable force to prevent a threat that Special Agent Valentine reasonably believed Garcia posed to himself and others.
76. Given what Special Agent Valentine knew about the underlying cocaine trafficking operation, Garcia's criminal history, Garcia's participation in the multi-kilogram cocaine purchase at his house on May 9, 2014, and Garcia's fleeing from his house when law enforcement officers arrived, and given that Garcia refused to comply with Special Agent Valentine's repeated, loud orders to get on the ground, to show his hands, and to get his hands out of his pockets, and instead bladed his body, sat on the porch, and moved his right arm in a manner consistent with reaching for a weapon from a holster, Special Agent Valentine reasonably believed Garcia was about to draw a handgun and shoot at him. Under these

circumstances, Special Agent Valentine's use of deadly force was not unreasonable.

77. Because Garcia did not meet his burden of proof in establishing that the United States is liable on either his battery or his negligence claims, Garcia is not entitled to damages.

## IV. CONCLUSION

In light of the Court's findings of fact and conclusions of law, the Court **ORDERS** the parties to confer and submit a Proposed Judgment. The parties shall submit the Proposed Judgment no later than **April 2, 2018**.

**IT IS SO ORDERED.**

March 23, 2018

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**